UNITED STATES of America,
Plaintiff,

v.

12 TRACTS OF LAND, COMPRISING 50.07 ACRES, MORE OR LESS, IN the COUNTY OF DARE, STATE OF NORTH CAROLINA, Fred W. Morrison et al., and Unknown Owners, Defendants.

Civ. No. 487.

United States District Court
E. D. North Carolina,
Elizabeth City Division.

April 11, 1967.

———◇———

Robert H. Cowen, U. S. Atty., by William S. McLean, Asst. U. S. Atty., for plaintiff.

Bunn, Hatch, Little & Bunn, Raleigh, N. C., for defendants Fred W. Morrison and others.

Hubert Humphrey, of McLendon, Brim, Brooks, Pierce & Daniels, Greensboro, N. C., for defendant Jerome B. Griffin.

## OPINION AND ORDER

LARKINS, District Judge:

### SUMMARY

This cause comes before the Court for trial without the intervention of a jury upon a Complaint in Condemnation filed by the United States of America, pursuant to Title 40, United States Code, Section 257 et. seq., to enable the United States Department of the Interior to acquire certain land in Dare County, North Carolina, for use in connection with the Fort Raleigh National Historic Site of the National Park Service, United States Department of the Interior. Authority for the taking is established by Title 40, United States Code, Section 258a, and jurisdiction in this Court is provided for in Title 28, United States Code Annotated, Section 1358.

Complaint was filed December 20, 1963, and Order for Delivery of Possession of the original twelve tracts was filed December 27, 1963. A year later, the Government amended its Complaint on December 23, 1964, to add three more tracts (Park Tracts No. 25, 30 & 31), and the Order for Delivery of Possession as to these was filed December 28, 1964. The estate taken was "full fee simple title, along with all water rights and other rights, tenements, hereditaments and appurtenances thereunto pertaining," subject to easements for streets, highways, and public utilities not taken in the declaration. Park Tract No. 25 was taken subject to an access easement reserved to the owners of the remainder of the larger tract from which it was severed, subject to absolute termination upon a new access route being opened between the remaining portion and U. S. Highway No. 64–264. Such a route has since been opened, but the degree of adequate service it provides the remaining tract is in dispute.

All defendants—ostensible owners and other claimants, known or unknown—were served in accordance with Federal Rule 71A(d). Pursuant to Federal Rule 71A(j) and Title 40, United States Code, Section 258a, sums estimated by the Solicitor of the Department of the Interior as just compensation for the lands taken in this action were set forth in the First and Second Declarations of Taking and deposited with the Clerk of this Court (on December 20, 1963, and December 23, 1964, respectively). Of the amounts deposited, the Court has allowed several ostensible owners to withdraw a portion of the sums deposited to their credit without prejudice to their rights to a full hearing and final determination of the issue of just compensation for

their property. The several tracts and park tract numbers, survey map tract numbers, names of ostensible owners, acreage, amount of estimated just compensation deposited, and amounts withdrawn in respect to each is as follows:

| PARK TRACT NUMBER | SURVEY MAP TRACT NUMBER | OSTENSIBLE OWNERS | ACREAGE | DEPOSIT | WITHDRAWALS |
|---|---|---|---|---|---|
| 2 | 3 | Fred W. Morrison and wife, Emma Neal Morrison | 11.93 | $  1.00 | $  1.00 |
| 3 | 4 | L. V. Rogers and wife, Matilda Dough Rogers | 0.35 | 2750.00 | 2700.00 |
| 4 | 5 | L. S. Dough, H. A. Dough, C. Worden Dough, Matilda D. Rogers, Glenn C. Dough, and Wynn T. Dough | 5.69 | 3150.00 | |
| 5 | 6 & 13 | Mary D. Craddock, William S. Pinner and wife, Aleta Pinner, Thomas M. Tillett and wife, Laura C. Tillett | 5.41 & 0.43 | 5100.00 | |
| 6 | 7 & 12 | Fred W. Morrison and wife, Emma Neal Morrison | 4.04 & 1.28 | 1.00 | 1.00 |
| 7 | 9 | Ralph W. Umphlett and wife, Margarette M. Umphlett | 1.64 | 3120.00 | 2808.00 |
| 8 | 2 | Fred W. Morrison and wife, Emma Neal Morrison | 11.02 | 1.00 | 1.00 |

| PARK TRACT NUMBER | SURVEY MAP TRACT NUMBER | OSTENSIBLE OWNERS | ACREAGE | DEPOSIT | WITH-DRAWALS |
|---|---|---|---|---|---|
| 9 | 16 | L. S. Dough, H. A. Dough, C. Worden Dough, Matilda D. Rogers, Glenn C. Dough and Wynn T. Dough | 4.60 | $13500.00 | $10125.00 |
| 15 | 15 | George C. Trautwein | 0.33 | 1300.00 | |
| 27 | 8 | John T. Garrison and wife, Dorothy S. Garrison | 0.36 | 1200.00 | |
| 28 | 11 | Muriel G. Daniels | 1.52 | 3200.00 | |
| 29 | 10 | John T. Garrison and wife, Dorothy S. Garrison and Edgar A. Perry and wife, Mary F. Perry | 1.47 | 2250.00 | |
| 25 | — | Estate of Jerome B. Griffin | 49.00 | 34700.00 | 26025.00 |
| 30 | — | Dare County | Streets | 1.00 | |
| 31 | — | State of North Carolina | State Highway No. 345 (portion) | 1.00 | |

A motion by the original defendants that the Court appoint three Commissioners to hear the evidence and determine the amounts of just compensation for each tract was allowed but subsequently rescinded upon further motion of the defendants, waiving trial by jury and requesting instead that the Court sit as both Judge and Jury, hear the evidence, and determine the amount of just compensation in respect to each tract taken. This latter motion was allowed, and the trial was held at a special term on Roanoke Island at Manteo, North Carolina, for the convenience of all parties and witnesses and to afford the Court an opportunity to view and inspect the respective tracts of land under consideration.

At the four-day trial, the owners of eight of the original tracts condemned were represented by counsel. As to the other four tracts, George C. Trautwein, ostensible owner of Park Tract No. 15 (Survey Tract No. 15), and Fred W. Morrison and wife, ostensible owners of Park Tract No. 2 (Survey Tract No. 3), Park Tract No. 6 (Survey Tract No. 7 & 12), and Park Tract No. 8 (Survey Tract No. 2), were all identified at the trial but were not present nor represented by counsel. They were, however, notified of the time and place of trial and indicated that they had no desire to be present. The ostensible owners of the three additional tracts taken (Park Tracts No. 25, 30 and 31—no survey map tract numbers were assigned), the Estate of Jerome B. Griffin, Dare County, and the State of North Carolina, respectively, were, with the exception of Dare County, represented by counsel.

Numerous exhibits were offered by the Government and by the landowners, some of which were admitted over objection, including abstracts of title, maps, surveys, aerial photographs, certified copies of deeds and deeds of trust, appraisal reports and memorandums of qualifica-tions of witnesses, photographs and slides, brochures, postcards, and a Congressional Committee Report from the House Committee on Interior and Insular Affairs (Report No. 644). The slides, brochures, photographs, and postcards were admitted for the limited purpose of illustrating the testimony of witnesses. Testimony of expert witnesses was adduced on behalf of the Government and the landowners as to the location, nature, and description of the lands involved and their expert opinions as to the highest and best use and fair market value of the tracts on the date of the taking. The Court also made a personal inspection of the tracts involved, mindful, however, that two years had elapsed from the date of taking to the date of the trial, and that the physical characteristics of many of the tracts had changed substantially during that time (some of the hearings were held upon part of the land taken, in the auditorium of the Park Service Administration Building erected thereon). For this reason, although it was of some aid to the Court to have an opportunity to view the boundaries of the respective tracts and their positions with reference to streets, highways and watercourses, little or no substantive weight was given to this viewing in reaching the Court's determination of values (the Court did not have the benefit of a view of the premises on or about the date of taking).

Following the trial of this action, final judgment was entered upon stipulation of compromise and settlement between the Government and the owners of three of the original tracts condemned: Park Tract No. 2 (Survey Tract No. 3), Park Tract No. 6 (Survey Tracts No. 7 & 12), and Park Tract No. 8 (Survey Tract No. 2), all owned by Fred W. Morrison and wife, Emma Neal Morrison. Neither Dare County nor the State of North Carolina participated in the trial, and the amount of deposit in respect to the tracts held by each (Park

Tracts No. 30 & 31) is not attacked as insufficient by either. In making its awards, then, the Court is concerned only with the following tracts:

| PARK TRACT NUMBER | SURVEY MAP TRACT NUMBER | OSTENSIBLE OWNERS | ACREAGE |
|---|---|---|---|
| 3 | 4 | Rogers, *et. ux.* | 0.35 |
| 4 | 5 | Dough, *et. al.* | 5.69 |
| 5 | 6 & 13 | Craddock, *et. al.* | 5.41 & 0.43 |
| 7 | 9 | Umphlett, *et. ux.* | 1.64 |
| 9 | 16 | Dough, *et. al.* | 4.60 |
| 15 | 15 | Trautwein | 0.33 |
| 27 | 8 | Garrison, *et. ux.* | 0.36 |
| 28 | 11 | Daniels | 1.52 |
| 29 | 10 | Garrison, *et. al.* | 1.47 |
| 25 | – | Griffin Estate | 49.00 |

FINDINGS OF FACT

I. *General Findings in Respect to All Tracts*

A. Background

The purpose for which these tracts are being taken is to add to the Fort Raleigh National Historic Site additional land closely associated with the first attempt to establish an English Colony within what are now the boundaries of the United States. The Site was established in 1941 with 18½ acres. Since that time, the number of annual visitors has steadily increased (90,800 in 1960; 110,-000 in 1962; 136,700 in 1963; and 145,-000 in 1964). This tremendous growth in visits by tourists has been attributed to the following factors: the popularity of the annual summer production of "The Lost Colony," an historical play dealing, on the very site of its occurrence, with the ill-fated attempt by Sir Walter Raleigh to establish the first permanent English settlement in the New World; great improvements in the road system serving the area, opening up this part of the country and this island in particular to tourists; the establishment of nearby public recreation areas under State and Federal auspices; and in large part, " * * * to the intrinsic merits of the Site and the desire of visitors to see the place which they have learned from their study of American history

(sic) to respect as the site of the first English Settlement.

"The 18½ acres which are within the present historic site are insufficient either to accommodate the influx of visitors or to preserve the whole area which Sir Walter Raleigh's colonists are believed to have occupied." House Committee on Interior and Insular Affairs, Revising The Boundaries of The Fort Raleigh National Historic Site in North Carolina, H.R.Rep.No. 644, 87th Cong., 1st Sess. 2 (1961).

"The additional area for the site, established by the Secretary of the Interior on April 5, 1941 * * * is needed for the protection of future archeological investigations and the general historical scene. The addition would also greatly facilitate the administration, development, and interpretation of the area. * * *

"A detached tract of about 52 acres (Park Tract #25, Griffin Estate), lying to the west of the Fort Raleigh National Historic Site, is believed to contain some of the colonial settlement area, since the entrance to the fort was known to have been on the west side. Through the inclusion and subsequent acquisition of this tract, preservation of its archeological values would be assured. Moreover, the proposed westward addition, if accomplished, would facilitate the closing of

State Route 345 (at least in part), since this dead end leads only to the western end of the island." Id., at 3, quoting from a letter from the Assistant Secretary of the Interior to the Speaker of the House of Representatives.

## B. Roanoke Island and the Area of the Taking

Roanoke Island is located in Dare County, North Carolina, and lies just off the coastal mainland between and parallel to that link in the chain of the Outer Banks known as the Southerly Tip of Bodie Island, just north of Oregon Inlet. It is bounded on the north by the lower extremities of Albemarle Sound, on the east by Roanoke Sound, by the upper extremities of Pamlico Sound on the south, and Croatan Sound courses between the western side of the island and the mainland. The length of the island runs generally northwest-southeast, similar to the neighboring Outer Banks. It is in the northwesternmost portion of the island that the tracts of land under consideration are situate, northwest of the Manteo Airport Road and the Village of Sunny Side, in a generally westerly direction from the juncture of N. C. Highway No. 345 and U. S. Highway No. 64–264. With the exception of Park Tract No. 25, a separate 49 acre tract at the northwesternmost tip of the island adjacent to the Elizabethan Garden and Roanoke Sound, all tracts are in the Fort Raleigh City area, some of them situated adjacent to or across the highway from the existing Fort Raleigh National Historic Site.

Until the late 1920's, Roanoke Island and the Outer Banks were accessible only by boat. Since that time, however, the island has become connected with the mainland and neighboring Bodie Island by modern bridges and highways. U. S. Highway 64–264 joins the northern end of the island with the mainland, stretching across the 3½ mile Umstead Memorial Bridge over Croatan Sound from Mann's Harbor and running across the width of the island and between several of the tracts under consideration, to join N. C. Highway 345 just south of Fort Raleigh City. From that point, the highways run south 2 miles to Manteo, the center of the island and county seat of Dare County. From Manteo, N. C. Highway 345 continues south down the length of the island to Wanchese, while U. S. Highway 64–264 turns east and runs across Roanoke Sound over Baum Bridge to Bodie Island, meeting N. C. Highway 158, and thereby providing ready access to Nags Head to the north and Oregon Inlet, Pea Island, and Hatteras to the south.

Prior to the construction of these highways, most of the inhabitants of this island and the Outer Banks depended upon the sea for their livelihood as commercial fishermen, hunting and sport fishing guides, seamen or boatmen, Coastguardsmen and lighthouse keepers. Since its connection with the mainland and the Outer Banks, however, the island and its economy has become increasingly more tourist-oriented, for the highway system through and across the island is one of only two routes of access by automobile to the Outer Banks. The result is that tourist traffic funnels through the island to and from the Outer Banks, in addition to those visitors who come primarily to enjoy the attractions of Roanoke Island itself. The numerous attractions in and about the proximity of the island have sparked a substantial growth in tourism in Dare County since the advent of a connecting network of modern, serviceable highways and bridges.

Three major National Park facilities —Fort Raleigh National Historic Site and Park Service Museum, Wright Brothers Memorial and Museum at Kill Devil Hills (site of the first powered airplane flight), and the Cape Hatteras National Seashore Recreational Area (lighthouses and lighthouse museums, Pea Island Wildlife Refuge, several public camp sites and fishing piers)—in addition to the natural attraction of the water and miles of unspoiled ocean and sound beaches, constitute the major attractions which bring tourists from in

and out of the state into the Roanoke Island area. The region is well known for the varied hunting and fishing (fresh, salt, sound and deep-sea) opportunities it offers, which, along with a climate favorable to each, constitutes an additional attraction.

Roanoke Island itself constitutes a considerable tourist magnet. Advertised as the "Birthplace of American History", the primary attractions are the Fort Raleigh National Historic Site, the symphonic outdoor drama "The Lost Colony", and the Elizabethan Garden, all of which are situate in the immediate area of the taking. Visitors may view the reconstructed fort and site of the first English settlement, visit the Park Service Museum, and may walk along a Park Service Nature Trail. In the Waterside Theatre at the Site, "The Lost Colony" has been presented every summer from June to August since 1937. The oldest and longest of all American outdoor symphonic dramas, it portrays the ill-fated attempt to establish a permanent English colony in the New World and the mystery surrounding the unsolved disappearance of the colonists. Adjacent to the Site, the Elizabethan Garden was built on ten and one-half acres as a memorial to the Elizabethan colonists. Supplementing the wide variety of indigenous growth, are specimens of plants known to have been grown in the time of Elizabeth I, as well as other native varieties, which, along with fountains, statutes, monuments, a sundial, old stone steps, and other artifacts, constitutes the typical features of the formal gardens of the Elizabethan Era.

The hunting and fishing (commercial and sport) opportunities on and around the island and surrounding sounds are added factors influencing the attractiveness of the island to tourists. Public boat launching facilities and yacht basin are located at Manteo and Wanchese, some 3 and 8 miles south of the area of the taking, and a county-maintained concrete runway airport is located within a mile of Fort Raleigh City.

The tourist trade is, of course, seasonal, most of it coming during the summer months. Nevertheless, the increasing influx of visitors (145,000 at Fort Raleigh in 1964) served to enhance potential sales of property in the area of the taking for summer cottages and permanent residences, as well as for tourist-oriented commercial use (motels, restaurants, gift and novelty shops).

It is a fact, however, that as of the date of taking, commercial development on Roanoke Island had centered primarily in the Manteo and Wanchese areas, most of it geared to tourism and commercial and sport fishing. Only limited commercial activity had taken place in the immediate vicinity of the Site, and this has consisted of gift and novelty shops serving the tourist trade.

As of the date of taking, there had been only minor utilization of land in the taking area for summer cottages and permanent residences, although a steady growth in demand for this use is implicit in the increased number of sales and rise in property values in and close by the locality during recent years prior to the taking. In addition to the towns of Manteo and Wanchese, most of the permanent and summer residential development has taken place north of Manteo along the highway and in the Mother Vineyard area, gradually spreading northward toward Fort Raleigh City, which was platted in 1938 into 72 lots.

Hence, although when aligned with the Manteo area, the Fort Raleigh area has not been as extensively developed, an increasing general demand for property for permanent residential and summer cottage use existed at the date of taking. As will be indicated, however, some of the tracts involved are also well-suited for commercial use, and specific findings will be made herein in respect to each tract.

Expert opinions and evidence of sales on the island warrant a general finding that the most desirable property on the island is that which has either highway or sound frontage, and, of this, the high-terrained frontage on the sounds is the

more valuable. The land lying behind the frontage property is generally less valuable, and, of this, the higher-lying property is more desirable.

### C. Comparable Sales

Evidence as to prices obtained in sales of similar property in the same locality was offered by the owners and the Government to prove the market value of the lands in question at the time of the taking. The Court has considered all of the sales, screening them by use of the following general criteria: the degree of similarity between the property in question and the property being evaluated; proximity in time between date of sale and date of valuation (date of taking); the nature of the sale, as determined by the circumstances under which it was made. Without setting forth an exhaustive list of all of the sales offered into evidence, the following were utilized by the Court in making its determination:

### Unimproved Interior Lots

*December, 1962:* Evans and Fearington to State of North Carolina, Book 110, Page 398, Dare County Registry, Lots 1, 3, 5 & 7 in Block 5, Fort Raleigh City Subdivision, having a total of 240 feet on proposed Virginia Avenue, for $2,400: $600 per 60 x 120 lot, or $10 per front foot.

*December, 1962:* Legett to State of North Carolina, Book 110, Page 420, Dare County Registry. Lots 9 & 10 in Block 5, Fort Raleigh City Subdivision, lying 732 feet from N. C. 345, 330 feet from Roanoke Sound, and adjacent to Survey Tract No. 15 (Trautwein Tract). Taken together as one 120' x 120' parcel, it comprises approximately 0.33 acre (14,400 sq. ft./14,520 sq. ft.), with frontage of 120 feet on both Raleigh Blvd. and Dare Avenue (dedicated but unpaved subdivision streets). Indicated purchase price is $1300: $3,900 per acre, or $10.83 per front foot.

*December, 1962:* Garren to State of North Carolina, Book 110, Page 425, Dare County Registry. Lots 4 & 6 in Block 5, Fort Raleigh City Subdivision,

each 60' x 120' lying 552 feet from N. C. 345 and 390 feet from Roanoke Sound. Taken together as one 120' x 120' parcel (approximately 0.33 acre) with frontage of 120 feet on unpaved but dedicated Dare Avenue, they sold for $1200; $3,-600 per acre, or $10.00 per front foot.

(An earlier sale of this same property in September, 1960, from Cannady to Garren, Book 95, Page 219, Dare County Registry, was for $1100; $550 per lot, or $9.17 per front foot (60 ft. ea.).).

*November, 1962:* Pegues to State of North Carolina, Book 110, Page 430, Dare County Registry. Lot 8, Block 5, Fort Raleigh City Subdivision (situate between the Legett and Garren lots), 60' x 120' with 60 feet of frontage on dedicated but unpaved Dare Avenue, for $600, or $10.00 per front foot.

*March, 1957:* Burnette to Trautwein, Book 76, Page 150, Dare County Registry. Lots 11 & 12, Block 5, Fort Raleigh City Subdivision, having a total of 120 front feet on Raleigh Blvd. (dedicated but unpaved), for $1200: $600 per 60' x 120' lot, or $10.00 per front foot. This is Survey Tract No. 15, taken in this action.

### Unimproved Interior Acreage

*May, 1963:* Reich to Morrison, Book 112, Page 613, Dare County Registry. A tract without frontage across N. C. 345 from Fort Raleigh, behind Survey Tract No. 1 and adjacent to Survey Tract No. 3, containing 11.02 acres, for $5,175 or $470 per acre. This is Survey Tract No. 2. It is unimproved second growth pine woodland, 15 to 17 feet above sea-level, basically level in terrain.

### Frontage on N. C. Highway 345

*December, 1962:* Fearing & Hassell to State of North Carolina, Book 110, Page 401, Dare County Registry. Three unimproved lots in Fort Raleigh City Subdivision (Block 6, lots 1, 2 & 6), with frontage of 120 feet on N. C. 345, 185 feet deep, taken as a single tract, for $1800; $15 per front foot.

*December, 1962:* Ward to Morrison, Book 112, Page 499, Dare County Regis-

try. Unimproved second-growth woodland containing 13.02 acres and having frontage of 431 feet on N. C. 345, for $7,400: $560 per acre, or $17.17 per front foot.

### Frontage on U. S. Highway 64–264

*May, 1963:* Payne to Morrison, Book 112, Page 577, Dare County Registry. Tract lying on south side of U. S. 64–264 directly across from Survey Tract No. 7, containing 1.28 acres and having 168 front feet on U. S. 64–264, for $1200, or $7.14 per front foot. This is Survey Tract No. 12.

*September, 1963:* Harvey to Randall, Book 116, Page 421, Dare County Registry. A tract located on the northwestern side of U. S. 64–264 next to Umstead Bridge, containing approximately one acre, 200 feet deep, with 210 feet of frontage on U. S. 64–264, for $2000, or $9.50 per front foot.

### Frontage on Both N. C. 345 and U. S. 64–264

*May 1963:* Payne to Morrison, Book 112, Page 555, Dare County Registry. This is Survey Tract No. 7 in the present action: a long, narrow tract of unimproved pine woodland running between N. C. 345 and U. S. 64–264, containing 4.04 acres, with 77 front feet on N. C. 345 and 169 front feet on U. S. 64–264, for $3000 or $750 per acre. Figured cn a total frontage basis (246 front feet total), the land was sold for $12.20 per front foot. Allotting one-half of the acreage and purchase price to each end of the tract and figuring on a separate end-footage basis, the following frontage prices are obtained: 77 front feet on N. C. 345 at $19 per front foot ($1,500 ÷ 77), and 169 front feet on U. S. 64–264 at $9 per front foot ($1500 ÷ 169).

### Frontage-Acreage Sales

*May, 1963:* Payne to Morrison, supra. Acreage: 4.04 at $750. Frontage: 246 total highway frontage at $12.20, or, taken separately, 77 front feet on N. C. 345 at $19 and 169 front feet on U. S. 64–264 at $9.

*December, 1962:* Ward to Morrison, supra. Acreage: 13.02 at $560. Frontage: 431 feet on N. C. 345 at $17.17.

*July, 1959:* Inge to Harvey, Book 86, Page 263, Dare County Registry. This is a 79.1 acre tract stretching inland from Croatan Sound along both sides of U. S. 64–264 for approximately 3058 feet, the highway running through the middle of the tract from Umstead Bridge in an easterly direction. The northwestern line adjoins the southwesternmost portion of the Jerome B. Griffin property not taken in this action as Park Tract No. 25. This land was unimproved at the time of the sale and had topographical and other physical characteristics comparable to the adjacent Griffin land. At the western line where the tract faces onto Croatan Sound (at Umstead Bridge), the highway right-of-way is 200 feet, leaving 1056 feet of sound frontage. Documentary stamps indicate that the sale price was $33,000, or $379 per acre. On a footage basis, the 1056 feet along Croatan Sound comes to $28 per front foot, while the total highway frontage of 5400 feet (approximately 2700 each side) comes to $6.11 per front foot.

In weighing this evidence, specific attention was given to the location, size, physical characteristics, general adaptability and surroundings of the purported similar parcels. In respect of location, the Court used a more flexible limit of proximity if the tract under consideration and the tract offered were in all other respects comparable. Fortunately, an entirely adequate number of sales of comparable land in the immediate location of the taking area were put into evidence.

Mindful that only sales consummated within a reasonable time of the taking are relevant in determining the market value of the property taken, the Court took into account the time elapsing between the sale and the date of the taking as bearing on the similarity of market conditions. As between two sales, both similar in all other respects, more weight was given to the one more recent in time to the date of the taking.

Attention was also given to whether or not each sale was an arms-length, voluntary sale and whether it was a sale of all or only part of an entire tract. Finally, if a sale was found to be comparable by the foregoing standards, due allowance was made for the existence of any improvements in using the sales price as an indicia of the fair market value of the tracts under consideration. As can be seen from the above list of sales which the Court deemed more helpful in arriving at its values, the vast majority of the sales offered into evidence were of unimproved land.

A number of the sales offered into evidence (even among those listed above) were given more weight than others for the simple reason that some, although comparable, were less comparable in degree or more remote in time. Because of unresolvable conflicts in evidence, two sales of improved land were incapable of being utilized by the Court: *Gray to State of North Carolina:* October, 1962; Book 110, Page 74, Dare County Registry. This is lot 4, Block 6, Fort Raleigh City Subdivision, having 63 feet on N. C. 345. A small house was on the lot. Witnesses for both parties testified that it was comparable land, it being directly across the highway from Survey Tracts No. 5, No. 6(a), No. 7, and approximately 230 feet south of Survey Tract No. 16 (Dough homeplace). However, the three witnesses referring to this sale disagreed upon the value of the house:

| | |
|---|---|
| Foreman (defendant): | $2000 |
| Young (defendant): | $3000 |
| Garber (government): | $6400 |

Taking the valuation of each against the sale price of $7500, the following breakdown is obtained as to the frontage on N. C. 345:

Foreman (defendant): $5500/63 ft. = $87 per front foot.
Young (defendant):　　 $4500/63 ft. = $71 per front foot.
Garber (government): $1100/63 ft. = $18 per front foot.

———◆———

As there was no evidence in the record upon which the Court could make a reasonable resolution of the differences, this sale was not used. *Mann to State of North Carolina:* February, 1963; Book 112, Page 140, Dare County Registry. This 2.5 acre tract with 431 feet of highway frontage is on the western side of N. C. 345 across from the original Fort Raleigh Site, adjacent to Survey Tracts No. 2 and No. 3 Again, the landowners' and government's witnesses fell into dispute, not only as to the value of the improvements, but also as to the sale price of the land.

| | Sale Price | Motel Units | Land |
|---|---|---|---|
| Foreman (defendant): | $38,000 | $20,000 | $18,000 |
| Garber (government): | $35,000 | $30,250 | $ 4,750 |

———◆———

Thus, when computed as either a small acreage sale or as a highway frontage sale, extremely wide discrepancies occur:

| | Per Acre | Foot Per Front |
|---|---|---|
| Foreman (defendant): | $7,600 | $42.00 |
| Garber (government): | $1,900 | $11.00 |

A variation of this magnitude prevents an otherwise potentially helpful sale of improved land from being utilized by the Court. At most, the Court can use the respective values of the parties only as some evidence of the range within which a fair price exists. Because again there is a lack of evidence in the record from which the Court can make its own evaluation as to what the land did sell for and what the fair market value of the improvements was, any further reliance on these figures would lead to speculation.

Still another sale, the *Steer-Mark Corporation Sale (Collington Island)* sold in December, 1963 for $135,000 (547.3 acres at $247) was given very little weight in arriving at the amount of just compensation to be allowed for the Griffin taking (Park Tract No. 25), not because of discrepancies in monetary figures, but because of a discrepancy in physical comparability. This land is comparable, for the most part, only to the swampy portion of the Griffin land remaining after the taking. It is very low, marshy land, while most of the Griffin land is at least 5 feet above sea level. Furthermore, the island is some 3½ miles north of Roanoke Island, across the conflux of the Albemarle and Roanoke Sounds, far removed from the vicinity of Fort Raleigh Site upon which the higher, more valuable "take" portion of the Griffin property abuts.

### II.  Specific Findings In Respect To Each Tract

*Park Tract No. 3, Survey Tract No. 4*

This is a small, rectangular-shaped lot, 100 x 160, containing 0.35 acres. It has frontage of 100 feet on N. C. 345 and is located across the highway from Fort Raleigh City Subdivision. It has an elevation of about 10 feet above sea level and had a small, four-room house on it at the date of the taking. The entire tract was taken. The highest and best use of this land is residential or business.

*Park Tract No. 4, Survey Tract No. 5*

This is a long, narrow tract of unimproved second growth pine woodland containing 5.69 acres, extending from N. C. 345 on the east to U. S. 64–264 on the west. It has frontage of 77 feet on N. C. 345 and 35 feet on U. S. 64–264. The south sideline is 1610 feet long, and the tract is approximately 180 feet at its widest point. It is generally level in terrain and lies about 10 feet above sea level. The entire tract was taken. There were no improvements of value as of the date of the taking. Highest and best use: residential lots, or use frontage for business, subdividing the interior portion into residential lots.

*Park Tract No. 5, Survey Tract No. 6 & 13*

This is also a long, narrow strip of unimproved second growth pine woodland running adjacent to Survey Tract No. 5, supra. The portion constituting Survey Tract No. 6 extends from N. C. 345 on the east to U. S. 64–264 on the west and contains 5.41 acres. It has 177 feet of frontage on N. C. 345 and 158 feet of frontage on U. S. 64–264. The northern boundary is 1610 feet long, and the southern side runs 1550 feet. The maximum width is the 1777 feet fronting on N. C. 345. Tract No. 6 actually consists of three separately-owned parcels, divided as follows:

*Survey Tract 6(a) (Tillett Tract):* 177 x 300 x 167 x 300, with 177 feet on N. C. 345, directly across from Fort Raleigh City Subdivision. This tract has a basically level terrain about 10 feet above sea level. It is wooded primarily with pines, and, with 177 feet facing on N. C. 345, would have been highly adaptable to residential subdivision purposes had it not been taken. There were no improvements, and the entire parcel was taken.

*Survey Tract 6(b) (Pinner Tract):* 158 x 575 x 136 x 400, with 158 front feet on U. S. 64–264. This tract also has a basically level terrain 10 feet above sea level and has a good stand of second growth pine woods, making it attractive and useful for residential lots along with the other parcels making up Survey Tract No. 6 and with Survey Tracts No. 5 & No. 7. Lots utilizing the 158 feet facing on U. S. 64–264 would be the more at-

tractive ones. This part of Survey Tract No. 6 is also unimproved and was completely taken.

*Survey Tract 6(c) (Craddock Tract):* 167 x 850 x 136 x 735, containing 2.5 acres, unimproved, and completely taken. This tract lies between parcels 6(a) and 6(b). It has no road frontage, but could have been best used for residential lots in conjunction with the rest of Survey Tract No. 6 and the two tracts on either side (Survey Tracts No. 5 and No. 7). Unless an easement or cartway to this parcel were purchased, this would be virtually the only manner in which this isolated parcel of land could be profitably utilized. As it stood at the time of the taking, however, these observations were based upon potential, not existent fact; therefore, it must be valued as an interior acreage tract without frontage or open access. Similar to the other portions of this entire tract, parcel 6(c) is thickly wooded, primarily with pines, and has a level terrain with good elevation of 10 feet above sea level.

Owing to the tall, attractive pine growth, level terrain and proximity to two highways—N. C. 345 and U. S. 64-264—Survey Tract No. 5, Survey Tract No. 6(a), (b) & (c), and Survey Tract No. 7 could all have been subdivided into an attractive residential subdivision. This, of course, would necessarily depend upon the willingness and cooperation of the several owners, but when viewing the contiguous properties with an eye to the highest and best use, this potential ought not to be overlooked.

*Survey Tract No. 13* is the small, triangular-shaped extension of Park Tract No. 5 (comprised of Survey Tracts No 6(a), (b) & (c) and No. 13) which lies just across U. S. 64-264 (on the southwest side) from Survey Tract No. 6(b). It contains 0.43 acres, has 115 feet of frontage on U. S. 64-264, and a maximum depth of 168 feet. Like Survey Tract No. 6(b), it is attractively wooded and unimproved, the highest and best use of which is residential or business.

*Park Tract No. 7, Survey Tract No. 9*

This tract represents a partial taking from a long, narrow tract adjacent to the southeastern boundary of Survey Tract No. 7 on the northeast side of U. S. 64-264. Similarly to Survey Tracts No. 5, No. 6 and No. 7, the entire tract extends from U. S. 64-264 to N. C. 345, with 255 feet of frontage on the former and 164 feet on the latter. The portion taken contains 1.64 acres and includes the 255 feet on U. S. 64-264, having a maximum depth of 600 feet back from the highway. On the date of the taking, a small house of little or no value was on the remainder portion of the land. Both the entire tract and the part taken were undeveloped second growth pine woodland of level terrain approximately 10 feet above sea level.

Before the taking, the entire tract had access to the highways located at either end and a total of 419 frontage feet, both of value to the development of the tract for residential use. Dividing the entire tract up into 3 parcels of approximate equal depth, it would have two with highway frontage and ready access and an interior parcel accessable from either end via the other two. After the taking, then, the remainder of the property, when viewed in this fashion, consisted of one frontage portion facing on N. C. 345 and the middle, interior portion with one of its former sources of access now severed and removed.

Thus, the taking interrupted and cut off the owner-controlled avenue of access to the southern end of the interior portion from U. S. 64-264 as well as having the same effect upon the flow of ownership from highway to highway. Either-end access and unbroken highway-to-highway ownership were attributes of considerable value to the entire tract before the taking, when it is viewed as attractive residential subdivision property; their severance and the resultant damage to the remainder portion are taken into account and compensated for in the Court's award.

*Park Tract No. 9, Survey Tract No. 16*

This is a 430' x 512' x 360' x 475' tract containing 4.60 acres, all of which is taken in this action. It is located on the north side of N. C. 345 adjacent to the Fort Raleigh National Historic Site, its western boundary constituting the eastern line of the existing Fort Raleigh Reservation (see Government's Exhibit No. 28). The tract is bounded on the northeast and southeast by Fort Raleigh City Subdivision, including dedicated but unpaved John White Blvd. and Virgina Avenue on these respective sides. The tract faces upon N. C. 345 across the road from Survey Tracts No. 4 and No. 5, having frontage here of 430 feet. The back line is approximately 350 feet from Roanoke Sound.

This is high-lying land (15 feet above sea level) with basically level terrain, and more improvements existed on this tract at the time of the taking than upon any of the others involved. Improvements were as follows: a large two-story frame dwelling house containing 1880 sq. ft. of living space, 369 sq. ft. of kitchen, 326 sq. ft. of porches, and one bath; a separate smaller wooden frame building used as living quarters; a small building used as a workshop; two very large grapevines; nineteen walnut trees; two large fig trees; several apple, pear, peach, and cherry trees. The homeplace appeared to be in generally fair condition, while the separate living quarters and the workshop were in need of repairs. Except for the above-mentioned trees and scattered pines, cedars, myrtle and other various plants and bushes, the land surrounding the house was open, cleared land.

The highest and best use of this land would be residential lots similar to neighboring Fort Raleigh City Subdivision. With streets already existing on three sides, only the extension of Eleanor Avenue to N. C. 345 would be required to conform this land with the Fort Raleigh City Subdivision pattern, requiring dedication of a strip of land approximately 50' x 500' in the path of Eleanor Avenue.

Owing to its location next door to the restored Fort, this tract has also an unique quality setting it apart from the other tracts taken in the original Declaration of Taking. Its intimate connection with the attempted establishment of the first permanent English settlement in America adds to it an inherent historical attribute of such significance as to enhance the pecuniary value of the land. Simply put, there is but just so much land on which the historians are reasonably certain the Fort and its immediate perimeter were situate, and it seems reasonable to this Court, in view of the increasingly large number of persons who visit the area each year to see the "Birthplace of American History", to conclude that there are many who would be more than willing, if given the opportunity, to pay more in order to own a home or cottage upon a portion of this land, whether for personal satisfaction or because of an interest in history for its own sake. Both Government and landowners' witnesses appraised this tract as the most valuable single tract of land on N. C. 345.

This tract has more trees at the rear portion than at the front. Except for the trees and other growth already described, the forward part of the land is clear, and the frontage along N. C. 345 has virtually no growth at all. These factors have all been weighed by the Court in arriving at its determination of what constitutes reasonable and just compensation for the taking of the land and its improvements.

*Park Tract No. 15, Survey Tract No. 15*

This tract consists of two unimproved lots in Fort Raleigh City Subdivision, platted as lots 11 & 12, Block 5 (see Government Exhibit No. 28). They are located at the corner of dedicated but unpaved Raleigh Blvd. and Virginia Avenue and are separated from Roanoke Sound by one tier of lots and Raleigh Blvd. Each lot is 60 feet wide and 120 feet deep, making the property being taken a 120-foot square, or 0.33 acres. The terrain is basically level, about 15 feet above sea level. These two lots are

comparable to adjoining lots 9 and 10 and lots 1, 3, 4, 5 and 7, all in the same platted block. The highest and best use of this tract is, of course, as residential lots.

### Park Tract No. 27, Survey Tract No. 8

This parcel represents an 0.36 acre partial taking from a larger 3.4 acre tract. It is located along the north side of U. S. 64–264, just across the highway from Survey Tract No. 10, and adjacent to Survey Tract No. 9. Like the other tracts in this area of the taking, this tract is thickly wooded, primarily with large, second growth pines. The triangular portion taken is 129½′ x 290′ x 195′ in size, taking 129½ out of 630 feet of frontage on U. S. 64–264. Highest and best use: residential or business lots.

### Park Tract No. 28, Survey Tract No. 11

This tract is part of a larger tract of unimproved pine woodland facing on the south side of U. S. 64–264 directly across from Survey Tract No. 9. The terrain is generally level, with an elevation of about 10 feet above sea level. The tract taken is 267′ x 228′ x 252′ x 298.8′, with 267 feet of frontage on U. S. 64–264. Before the taking, the entire tract was a 4.2 acre tract with 267 feet of frontage on U. S. 64–264, the southeastern and northwestern boundaries of which extend 1081 feet and 471 feet, respectively, to the rear line, at which point the tract is 520 feet wide (see Defendant's Exhibit No. 1). The 1.52 acre taking was of only about ⅓ of the entire tract, but the remainder was substantially damaged by the severance. Prior to the taking, owner-controlled access was available to the entire tract via the highway frontage on the north end. The taking, however, appropriated all of the 267 feet of highway frontage and left a 2.7 acre parcel cut off without access to any road, greatly diminishing the value of the remainder. At the time of the taking, the highest and best use was for residential lots.

### Park Tract No. 29, Survey Tract No. 10

This tract is located on the south side of U. S. 64–264 adjacent to the western boundary of Survey Tract No. 11 (above). Prior to the taking, this was a 4.0 acre tract of thickly-wooded land having 616 front feet on U. S. 64–264. The taking removed 1.47 acres and 196 front feet from the total, leaving 2.53 acres and 420 front feet remaining. The land is well-elevated (about 10 feet above sea level) and of generally level terrain. Highest and best use: residential and business.

### Park Tract No. 25 (Griffin Tract)

This tract is part of a 200-acre tract constituting the northwest end of Roanoke Island and is the largest tract involved in the action. This end of the island juts into the conflux of the Roanoke, Albemarle and Croatan Sounds, thereby providing sound frontage on three sides. As can be seen from Defendant's Exhibit No. 4, the shoreline boundary runs around the tip of the island from a point near the Elizabethan Garden on the east to the Old Ferry Dock on the west just above William B. Umstead Bridge. The inland boundary of the Griffin property runs in a southwesterly direction across the width of the island between these same points, keeping north of the Old Ferry Dock Road. N. C. 345 runs east-west from Fort Raleigh City past the Historic Site and the Garden through the northeastern portion of the property to the shore of the Roanoke Sound.

The 49-acre portion being taken is located in the northeastern part of the property, just west of the Elizabethan Garden and adjacent to the Roanoke Sound. The inland boundary of this parcel runs from the shore of the Roanoke Sound in a southwesterly direction for a distance of 1356 feet, then turns abruptly to the northwest for 2500 feet to the northwestern shore of the island which faces upon the conflux of the Croatan, Albemarle and Roanoke Sounds. N. C. 345 cuts through the center of this "take" tract, providing approximately 2100 feet of frontage on each side of the road. Sound frontage along the shore of this tract totals approximately 3,300 feet. Included in the 49 acres is a one-

acre graveyard for which no compensation is being allowed.

The terrain of the entire 200-acre tract slopes gradually from east to west. Moving along a topographical map depicting the contour intervals at this end of the island (see Defendant's Exhibit No. 36), the land falls off from 15–20 feet above sea level in the eastern, or "take" portion, to 5–10 feet above sea level in the upper portion of the 151-acre remainder. At this point, the terrain drops from 5 feet or more above sea level to sea level, with a large ponding area lying in or about the center of the lower half of the remainder tract which connects with the Croatan Sound. This lower half of the remainder tract is generally low-lying swamp and marsh land, with the exception of two small knolls near the Old Ferry Dock on the Croatan Shore.

Except for the remains of some old, burned-out structures and the graveyard, the Griffin property was unimproved at the time of the taking. On either side of N. C. 345, the 49 acre "take" portion was well-forested with tall, attractive second growth pines and a thick hardwood understory. The undergrowth was dense in this area, much of it consisting of myrtle and small gum trees. On the north side of N. C. 345, the presence of live oaks increased as one neared the high-bluff shore of the Roanoke. Moving westward around the shoreline, the presence of live oaks decreased as the high-bluff contour began to drop off, beginning near a point just down from where N. C. 345 runs up to the sound and diminishing almost entirely as one approaches the point where the inland boundary of this tract adjoins the shoreline (see Defendant's Exhibit No. 36). From Northwest Point on around to the Old Ferry Dock, the contour of the land lying inland from the shore becomes very low (5 feet above sea level and below), and the shore growth is predominantly cypress.

The shoreline around the entire tract has very little sandy beach, most of it belonging to the higher-lying 49-acre part being removed by the taking. Out from the end of the highway in the water were some sizeable pieces of asphalt, some rocks and tree stumps. The beach itself in this area had an abundance of stumps, cypress knees and debris. The depth of the water was 2 feet at 200 feet out from shore, waist deep at 700 feet, according to witness Garber, who also testified that the bottom was rocky for the first 200 feet out from the end of the highway, smoother beyond.

Evidence was also received regarding beach erosion and storm damage. The Government's expert in this field, Dr. Dolan, testified regarding to the gradual shoreline recession along this part of Roanoke Island, pointing out that this end of the island is subject to a greater degree of shoreline erosion than the rest of the island. According to this witness, shoreline recession occurred here at a rate of approximately 5 feet per decade; it could, he testified, be controlled by use of bulkheads.

All of the witnesses were in agreement that the high-lying land on either side of N. C. 345 and the high-bluff frontage along the Roanoke making up the 49-acre tract constitutes the choice part of the Griffin property, and that the Government took the high land and left the low land. They also agreed that the remainder portion of the entire tract suffered considerable depreciation in value as a result of the severance, disagreeing, of course, on the total amount of compensation which should be awarded for the taking.

The highest and best use to which the entire 200-acre tract could have been put would have been a residential development. Witnesses for both of the parties concurred that a market demand existed for this use on the date of the taking. One of the ostensible owners of the land, Jerome B. Griffin, Jr., testified that he had investigated its development possibilities, and his expert witnesses gave extensive evidence as to this potential.

Witness Rand (for defendant Griffin) pointed out that the more desirable land

is the high-bluff sound frontage on the north side of N. C. 345, and that desirable high, dry land is located on the south side of the highway until one reaches the area just below where the new "access road" was built; that there is good tree growth on the area taken, while a ponding area appears near the southern end. This witness suggested residential development for the entire tract, except for 15–20 acres in the southern portion (ponding area) which he would make into a yacht basin. Rand stated that a good market demand existed for this use of the land because it is ideally situated for travel to the Outer Banks and its beaches.

Witness Templeton (for defendant Griffin) admitted as an expert in land development, testified that the Griffin property compares favorably with other coastal properties similar to this which have been developed, such as Southern Shores Development (near Wright Memorial), lots in which sold for $50 on the waterfront and $40 on the lagoon. Templeton indicated that the outstanding view was a factor used in arriving at his valuation of the high-bluff sound property. In his opinion, the highest and best use of the Griffin property at the time of the taking was for a high-type, residential retirement resort area.

Lewis C. Garber (for Government) divided the tract up into three general categories for appraisal purposes: (1) 24 acres of land north of N. C. 345; (2) 25 acres of land south of N. C. 345; (3) the remaining 151 acres below the latter, not taken by the Government. This witness testified that in his opinion the highest and best use of the property was as a residential development, indicating that there would first be some holding period, but not saying how long. Garber also indicated that market demand and market values for sound front property had increased since 1961; that prior to that time, the interest was predominantly in ocean front property, but that it was now inland waterfront property because of the view and because of hurricanes, which hit the beaches more

severely than the sound front. The opening of Alligator River Bridge in 1962 was also a contributing factor, according to Garber for the reason that it opened up a more direct avenue between the middle of the state and this area. Umstead Bridge, linking the island with the mainland, had already been opened in 1957. Proximity to Fort Raleigh and the Elizabethan Garden would, Garber admitted, enhance the value of the Griffin land, for prior to the taking the entrance to the property (N. C. 345) went past these two points of interest.

David Stick (for Government), admitted as an expert in real estate appraisals and as an expert in the History of Dare County, testified that the Griffin property is unique and is an excellent piece of land for residential development, giving it "the highest per acre value I have ever fixed in Dare County". Stick listed specific factors which he considered in arriving at his valuation. The favorable factors were: high land in the northern portion of the tract; high sound frontage; excellent view; frontage on hard surface road (N. C. 345); sufficient growth of timber for attractive residential lots; proximity to Fort Raleigh and the Elizabethan Garden; "no other property like this on the face of the earth". Minus factors were: population and stronger market is centered in and about Manteo, although recent trend is growth towards the northern end of the island; no zoning in this end of the island and it is outside of municipal control; N. C. 345 is not located the way he would have run it, to give maximum frontage in the most desirable high-lying area; smaller areas are better for development than large ones; erosion along shoreline: would have to put in bulkheads and back up and fill, to make the shore more attractive (estimated cost of $9–10 per level ft. at 3300 feet); trash along beach and in shallows would have to be removed for bathing, although depth is excellent for children.

Regarding the access road, Stick made his appraisal on the basis that it would, when finished, be a paved (asphalt)

road; he indicated on cross examination that control of the entrance of the road to the property is an important factor, which the Griffins no longer have; that before the taking, the Griffins had 2500 feet of ways they could get into their property (along both sides of N. C. 345), and that now they have only the 60 foot width of the end of the W. R. Pearce Access Road; that the 151 acres remaining needed the 49 acres to provide this access, and that this is where severance damage came into his appraisal.

When this tract was taken, N. C. 345 was taken long with it as Park Tract No. 31. This not only removed approximately 4,200 feet of total road frontage from the entire tract, but it also severed the only avenue of access and isolated the 151-acre part left remaining. The taking was subject to an access easement reserved to the owners of the remainder of the larger tract from which it was severed (see Defendant's Exhibit No. 38), but this easement was made subject to absolute termination upon the opening of a new access route between the remaining portion and U. S. 64–264.

Since the date of the taking, an access road has been cut from U. S. 64–264 across the land of W. R. Pearce to the remaining portion of the Griffin property, thereby terminating the easement. The road is an unpaved State-maintained, secondary road having a good clay subsoil and marl top, about 2500 feet long and 18–20 feet wide with a 60 foot right-of-way. This road is not by any means comparable in composition or location to N. C. 345, the latter being an asphalt-paved State Highway running through the more valuable portion of the entire tract all the way to Roanoke Sound, directly connecting the immediate area with the Historic Site and the rest of the island. The "replacement" access road provides only dead end access to a point just inside the edge of the northern one-third portion of the remainder tract. Hence, the primary function and only useful purpose served by this road is that of terminating the easement which was temporarily reserved to the owners over N. C. 345.

As a practical matter, the remaining portion has been left with no useful access: at its end, the road runs up against a tall pine forest at the Griffin line. To go further into the remaining tract would require the cutting of trees and removal of stumps for a road comparable even to the access road. Thus, while before the taking, the entire tract had a paved State Highway through its northern portion to the sound, the remainder after the taking has no route across the land to the sound which connects the two sides. As one witness put it, the "front door" of the Griffin property has been taken away, and there is no control over the property lying on either side of the new road running up to the line of the remaining portion. Valuable frontage has been removed, and it would be a highly expensive operation to run a road comparable to N. C. 345 across the remainder tract from where the access road stops to the sound, a distance of approximately 2,400 feet by the most direct route.

Other than by boat, this minimum access road is the only outlet for 151 acres of land: When viewed from a development standpoint, there remains no road traversing the land from which other roads or streets might feed. It is the conclusion of this Court that the new access road provides only bare minimum access to the remaining portion of the entire tract, and that its presence only slightly offsets the depreciation in the value of the remainder caused by the taking.

Another consideration affecting the value of the remainder is the fact that the Government took most of the higher-lying land and left the owners with the low land. From a development standpoint, this leaves much less soil to raise the level of the low-lying acreage making up nearly one-half of the remainder, for the upper one-half could not withstand a borrow to the extent it would be needed to make the low area useable for a residential subdivision.

The Court has considered all of the foregoing factors in light of the market demand existing at the time of the taking for the use indicated and the fact that extensive beach-clearing, land-filling, dredging and road-cutting would have been required before the full market potential could have been realized.

## CONCLUSIONS OF LAW

The following conclusions of law are applicable to each and all of the tracts involved in this action:

1. That the tracts of land being taken in this proceeding are situate within the territorial jurisdiction of this Court, to wit: in Dare County, North Carolina, Elizabeth City Division of the United States District Court for the Eastern District of North Carolina;

2. That this Court has jurisdiction over the subject matter of this proceeding, pursuant to 28 U.S.C.A. § 1358;

3. That this Court has jurisdiction over the persons of the parties to this action, pursuant to Rule 71A(d) of the Federal Rules of Civil Procedure;

4. That the plaintiff in this action, The United States of America, has the authority to condemn and appropriate the subject matter of this proceeding, pursuant to 40 U.S.C. § 258a;

5. That the procedure governing the institution and trial of this proceeding is provided by Rule 71A, Federal Rules of Civil Procedure, 40 U.S.C. § 258a, and Rule 52, Federal Rules of Civil Procedure;

6. That title to the tracts of land in question vested in the United States of America and the right to just compensation for the taking of the same vested in the persons entitled thereto upon the filing herein of the Declarations of Taking by the plaintiff and deposit in the Court, to the use of the persons entitled thereto, of estimated amounts of just compensation for the tracts taken;

7. That the estate taken and acquired by the United States of America was full fee simple title, along with all water rights and other rights, tenements, hereditaments and appurtenances thereunto pertaining, subject to any easements not expressly taken in the Declarations of Taking;

8. That the dates of taking of the respective tracts were as follows: *December 20, 1963*: all tracts except Park Tracts No. 25, No. 30, and No. 31; *December 23, 1964*: Park Tracts No. 25, No. 30, and No. 31.

9. That the issue presented to the Court for decision is what amount of damages should be awarded to the several owners as just compensation under the mandate of the Fifth Amendment to the Constitution of the United States for the taking of their respective properties;

10. That the measure of just compensation for each tract taken is as follows: (a) in the case of an entire taking, the fair market value of the tract on the date of the taking;

(b) in the case of a partial taking, the difference between the fair market value of the whole tract immediately before the taking and the fair market value of the part left remaining immediately after the taking, taking into consideration any special benefits inuring to the remainder by reason of proximity to the Government's project which have increased its "after" value, as well as any depreciation in the value of the remainder by reason of the severance.

11. That it is the considered judgment of this Court that the ostensible owners of the several tracts taken in this proceeding are entitled to recover of the condemnor, The United States of America, as fair, reasonable and just compensation for the taking of their properties, the amounts indicated hereinafter as the Court's Awards of Compensation.

## AWARDS OF COMPENSATION

Park Tract No. 3, Survey Map Tract No. 4: 0.35 acres; Complete Taking

Witnesses for both sides offered evidence as to valuation of this property as of the date of taking. Their testimony is summarized as follows:

Defendants' Evidence:

| Foreman: | $8,000 | |
| Young: | $6,000 | Appraised lot without house, at $60 per front foot. |
| Rand: | $6,000 | $4000 for land<br>$2000 for house |

Government's Evidence:

| Garber: | $3,500 | $1250 for land<br>$2250 for improvements |

Court's Valuation and Award

Date of Taking: December 20, 1963.

The fair market value of the tract at the time of the taking was $4,375.00.

The amount which the Government should pay as just compensation for the property taken in this proceeding as Park Tract No. 3, Survey Map Tract No. 4, exclusive of interest, is $4,375.00.

Park Tract No. 4, Survey Map Tract No. 5: 5.69 acres; Complete Taking

Witnesses for both sides offered evidence as to valuation of this property as of the date of the taking. Their testimony is summarized as follows:

Defendants' Evidence

| Foreman: | $10,950 | |
| Young: | $10,030 | $60 per front foot |
| Rand: | $12,200 | |

Government's Evidence

| Garber: | $ 4,300 | $750 per acre |
| Stick: | $ 4,520 | $10 per front foot |

Court's Valuation and Award

Date of Taking: December 20, 1963

The fair market value of the tract at the time of the taking was $5,650.00.

The amount which the Government should pay as just compensation for the property taken in this proceeding as Park Tract No. 4, Survey Map Tract No. 5, exclusive of interest, is $5,650.00.

Park Tract No. 5, Survey Map Tract No. 6 & 13: 5.41 & 0.43 acres; Complete Taking

Park Tract No. 5 is comprised of four separately-owned tracts, indicated by the Survey Map as Survey Map Tracts No. 6(a), No. 6(b),

No. 6(c), and No. 13. Expert witnesses' appraisals and the Court's valuations and awards are therefore set forth separately.

### Survey Map Tract No. 6(a) (Tillett Tract)

Witnesses for both sides offered evidence as to valuation of this property as of the date of the taking. Their testimony is summarized as follows:

Defendants' Evidence

Foreman:    $ 7,080
Young:      $10,620
Rand:       $ 8,850

Government's Evidence

Garber:     $ 2,124    $12 per front foot, appraising 6(a), 6(b), and 6(c) as a single tract at $5,500

Stick:      $ 1,770    $10 per front foot, appraising 6(a), 6(b), and 6(c) as a single tract at $5,145

Court's Valuation and Award

Date of Taking: December 20, 1963

The fair market value of the tract at the time of the taking was $3,039.09.

The amount which the Government should pay as just compensation for the property taken in this proceeding as Park Tract No. 5, Survey Map Tract No. 6(a), exclusive of interest, is $3,039.09.

### Survey Map Tract No. 6(b) (Pinner Tract)

Witnesses for both sides offered evidence as to valuation of this property as of the date of the taking. Their testimony is summarized as follows:

Defendants' Evidence

Foreman:    $ 7,900
Young:      $ 5,510
Rand:       $ 9,480

Government's Evidence

Garber:     $ 1,896    $12 per front foot, appraising 6(a), 6(b), and 6(c) as a single tract at $5,500

Stick:      $ 1,580    $10 per front foot, appraising 6(a), 6(b), and 6(c) as a single tract at $5,145

Court's Valuation and Award

Date of Taking: December 20, 1963

The fair market value of the tract at the time of the taking was $2,370.00.

The amount which the Government should pay as just compensation for the property taken in this proceeding as Park Tract No. 5, Survey Map Tract No. 6(b), exclusive of interest, is.$2,370.00.

Survey Map Tract No. 6(c) (Craddock Tract): 2.5 acres

Witnesses for both sides offered evidence as to valuation of this property as of the date of the taking. Their testimony is summarized as follows:

Defendant's Evidence

| | |
|---|---|
| Foreman: | $2,300 |
| Young: | $1,050 |
| Rand: | $2,500 |

Government's Evidence

Garber: $1,480    This figure was obtained by the Court by adding the witness' valuations of Survey Map Tracts No. 6(a) and No. 6(b) and subtracting the sum from $5,500, the witness having appraised the three separately-owned tracts as a single tract at that amount.

Stick: $1,795    This figure was obtained by the Court by adding the witness' valuations of Survey Map Tracts No. 6(a) and No. 6(b) and subtracting the sum from $5,145, the witness having appraised the three separately-owned tracts as a single tract at that amount.

Court's Valuation and Award

Date of Taking: December 20, 1963

The fair market value of the tract at the time of the taking was $1,175.00.

The amount which the Government should pay as just compensation for the property taken in this proceeding as Park Tract No. 5, Survey Map Tract No. 6(c), exclusive of interest, is $1,175.00

Survey Map Tract No. 13

Witnesses for both sides offered evidence as to valuation of this property as of the date of the taking. Their testimony is summarized as follows:

Defendant's Evidence

| | | |
|---|---|---|
| Foreman: | $4,600 | |
| Young: | $1,725 | $15 per front foot |
| Rand: | $3,450 | |

Government's Evidence

| | | |
|---|---|---|
| Garber: | $1,000 | $8.50 per front foot |
| Stick: | $1,200 | |

Court's Valuation and Award

Date of Taking: December 20, 1963

The fair market value of the tract at the time of the taking was $1,610.00.

The amount which the Government should pay as just compensation for the property taken in this proceeding as Park Tract No. 5, Survey Map Tract No. 13, exclusive of interest, is $1,610.00.

Park Tract No. 7, Survey Map Tract No. 9: 1.64 acres; Partial Taking

Witnesses for both sides offered evidence as to valuation of this property as of the date of the taking. Their testimony is summarized as follows:

Defendants' Evidence

| Foreman: | $12,745 | $24,745 Before | |
| | | −12,000 After | |
| | | $12,745 Damages | |
| Young: | $11,470.05 | $45 per front foot | (Used 254 feet) |
| Rand: | $15,294 | $20,294 Before | |
| | | − 5,000 After | |
| | | $15,294 Damages | |

Government's Evidence

| Garber: | $3,100 | $12 per front foot | (Used 254.9 feet) |
| Stick: | $3,825 | $15 per front foot | |

Court's Valuation and Award

Date of Taking: December 20, 1963

The fair market value of the entire property immediately prior to the taking, including the condemned portion identified in this proceeding as Park Tract No. 7, Survey Map Tract No. 9, was $7,781.00.

The fair market value of the portion remaining immediately after the taking was $2,956.00.

The resulting and severance damage reflected in the valuation of the portion remaining immediately after the taking is $1,000.00.

The amount which the Government should pay as just compensation for the property taken in this proceeding as Park Tract No. 7, Survey Map Tract No. 9, exclusive of interest, is $4,825.00.

Park Tract No. 9, Survey Map Tract No. 16: 4.60 acres; Complete Taking

Witnesses for both sides offered evidence as to valuation of this property as of the date of the taking. Their testimony is summarized as follows:

Defendants' Evidence

Foreman: $43,800 No breakdown, but witness indicated that this figure included the land, two-story Dough homeplace, another small house, a small garage or workshop, 2 grape vines, described as "enormous", 19 walnut trees, 2 large fig trees, a few apple trees, and "other scattered trees".

Rand: $41,200

Breakdown

Land: "4.65 acres of N. C. Highway 345, 430′ by 472′ with streets on three sides. It was

situated adjacent to Fort Raleigh, and was the most valuable single tract of land on N. C. Highway 345 because of its location, size, accessibility, and terrain."

Value        $23,250.00

Improvements:

| | | |
|---|---|---|
| "1. | Two-story frame house containing:<br>    1880 sq. ft. living space<br>    360 sq. ft. kitchen<br>    326 sq. ft. porches<br>    1 bath | 14,100.00 |
| 2. | One separate house—living quarters | 1,000.00 |
| 3. | One workshop | 1,500.00 |
| 4. | Two large grapevines (one measured 60′ x 40′) | 1,000.00 |
| 5. | Nineteen Walnut trees | 850.00 |
| 6. | Two large fig trees | 200.00 |
| 7. | Apple, pear, peach, and cherry trees | 300.00 |
| | TOTAL | $41,200.00" |

Government's Evidence

Garber:      $17,500    $ 7,800 for 4.60 acres
                               9,700 for all improvements

                     $17,500

Court's Valuation and Award

Date of Taking: December 20, 1963

The fair market value of the tract and all improvements at the time of the taking was $29,025.00.     Breakdown

| | |
|---|---|
| Land: | $17,200 |
| Two-story frame house: | 9,400 |
| All other improvements: | 2,425 |
| | $29,025 |

The amount which the Government should pay as just compensation for the property taken in this proceeding as Park Tract No. 9, Survey Map Tract No. 16, exclusive of interest, is $29,025.00.

Park Tract No. 15, Survey Map Tract No. 15: 0.33 acres; Complete Taking

Although given full opportunity to do so, the ostensible owner of this property did not put on any evidence as to valuation of this property as of the date of the taking. One witness for the Government gave evidence as to valuation of this property as of the date of the taking, which is summarized as follows:

Government's Evidence

Stick:              $1600

Court's Valuation and Award

Date of Taking: December 20, 1963

The fair market value of the tract at the time of the taking was $1,600.00.

The amount which the Government should pay as just compensation for the property taken in this proceeding as Park Tract No. 15, Survey Map Tract No. 15, exclusive of interest, is $1,600.00.

Park Tract No. 27, Survey Map Tract No. 8: 0.36 acres; Partial Taking

Witnesses for both sides offered evidence as to valuation of this property as of the date of the taking. Their testimony is summarized as follows:

Defendants' Evidence

Foreman:    $6,450    $34,650 Before
                             −28,200 After (no severance damages allowed)

                             $ 6,450 Damages

Young:    $3,201.30    $30 per front foot

Rand:    $3,425    $37,800 Before
                             −34,375 After

                             $ 3,425 Damages

Government's Evidence

Garber:    $1,300    $7,600 Before    Witness figured 129.5 front feet at $10 per front foot and rounded $1293 to $1300, allowing no severance damages. Evidently he figured his before and after on an acreage basis, but this is not clear.
                             −6,300 After

                             $1,300 Damages

Stick:    $1,500    No severance damages

Court's Valuation and Award

Date of Taking: December 20, 1963

The fair market value of the entire property immediately prior to the taking, including the condemned portion identified in this proceeding as Park Tract No. 27, Survey Map Tract No. 8, was $9,450.00.

The fair market value of the portion remaining immediately after the taking was $7,507.50.

No compensable severance damages result from this taking.

The amount which the Government should pay as just compensation for the property taken in this proceeding as Park Tract No. 27, Survey Map Tract No. 8, exclusive of interest, is $1,942.50.

Park Tract No. 28, Survey Map Tract No. 11: 1.52 acres; Partial Taking

Witnesses for both sides offered evidence as to valuation of this property as of the date of the taking. Their testimony is summarized as follows:

### Defendant's Evidence

Foreman:     $16,685    $17,185 Before
    —   500 After    (Exact amount of severance damage not indicated)

    $16,685 Damages

Young:     $12,015    $13,890 Before
    — 1,875 After    (Exact amount of severance damages not indicated)

    $12,015 Damages

Rand:     $15,020    $16,020 Before    Severance Damages:
    — 1,000 After    witness' written report, filed June 3, 1966, reads as follows:
    $15,020 Damages

"The amount taken from this tract was only 1.52 acres, leaving approximately 2.7 acres. However, the remaining land is cut off from access to any road, and has only a nominal value of $1,000."

### Government's Evidence

Garber:     $3,500    $4,000 Before at $15 per front foot
    — 500 After value of remainder (amount of severance damages not indicated)

    $3,500 Damages

Stick:     $4,005    $5,500 Before
    —1,495 After (Exact amount of severance damages is not indicated)
    $4,005 Damages

### Court's Valuation and Award

Date of Taking: December 20, 1963

The fair market value of the entire property immediately prior to the taking, including the condemned portion identified in this proceeding as Park Tract No. 28, Survey Map Tract No. 11, was $8,500.00.

The fair market value of the portion remaining immediately after the taking was $1,625.00.

The resulting and severance damage reflected in the valuation of the portion remaining immediately after the taking is $2,875.00.

The amount which the Government should pay as just compensation for the property taken in this proceeding as Park Tract No. 28, Survey Map Tract No. 11, exclusive of interest, is $6,875.00.

Park Tract No. 29, Survey Map Tract No. 10: 1.47 acres; Partial Taking

Witnesses for both sides offered evidence as to valuation of this property as of the date of the taking. Their testimony is summarized as follows:

### Defendants' Evidence

Foreman:   $11,760   $36,960 Value of Entire Tract Before Taking

−25,200   Value of Tract taken (No severance damages)
_____
$11,760 Damages

Young:   $ 8,820   196 feet frontage at $45 per front foot.

Rand:   $11,760   $36,960 Before taking, for 616 feet on U. S. 64–264

−25,200 After taking, for 420 feet on U. S. 64–264

(No severance damages indicated)
_____
$11,760 Damages

### Government's Evidence

Garber:   $ 2,400   $ 7,400 Before

− 2,400 Value in the Taking: 196 feet on U. S. 64–264 at $12 per front foot, $2,352, rounded off by witness to $2,400
_____
$ 5,000 After Value of the Remainder, making no allowance for severance damages.

Stick:   $ 3,332   196 feet on U. S. 64–264 at $17 per front foot.

### Court's Valuation and Award

Date of Taking: December 20, 1963

The fair market value of the entire property immediately prior to the taking, including the condemned portion identified in this proceeding as Park Tract No. 29, Survey Map Tract No. 10, was $15,400.00.

The fair market value of the portion remaining immediately after the taking was $10,500.00.

No compensable severance damages result from this taking.

The amount which the Government should pay as just compensation for the property taken in this proceeding as Park Tract No. 29, Survey Map Tract No. 10, exclusive of interest, is $4,900.00.

Park Tract No. 25 (Griffin Tract): 49.0 acres; Partial Taking

Witnesses for both sides offered evidence as to valuation of this property as of the date of the taking. Their testimony is summarized as follows:

Young: $231,000      Breakdown

$336,500   Before Taking, for 200 acres
−115,500   Portion Remaining: 150 acres

$221,000   Difference
+10,000   Added severance damages, "for the reason that he has been denied main access; a paved road has been taken from him; furthermore, he had the protection of Fort Raleigh, and now he has no protection on Highway 64."

$231,000

Rand:   $161,000   $300,000   Before: 200 acres at $1500 per acre
−139,000   After: 151 acres

$161,000   Damages for taking of 49 acres

Breakdown

| | |
|---|---|
| $ 48,000 | 24 acres immediately north of N. C. 345 at $2,000 per acre |
| 36,000 | 24 acres immediately south of N. C. 345 at $1,500 per acre |
| $ 84,000 | for "take" portion of 48 acres, excluding graveyard. |
| $139,000 | Value of Remainder Tract After Taking |
| 75,000 | Severance Damages computed at $500 per acre for 150 acres |
| $216,000 | Value of Remainder Tract Before Taking |
| $ 84,000 | Value in the Taking ($48,000 + $36,000) |
| 216,000 | Value of Remainder Tract Before Taking |
| $300,000 | Value of Entire Tract Before Taking |

Templeton:   $168,400

$326,500   Before     200 acres
−158,100   After     151 acres

$168,400   Damages

Breakdown

| | Before | | |
|---|---|---|---|
| 30 acres | High Bluff Waterfront | at $3,500 | $105,000 |
| 29 acres | Interior Road Frontage | at $2,000 | 58,000 |
| 101 acres | Interior Wooded Land | at $1,500 | 151,500* |
| 40 acres | Low Land | at $ 300 | 12,000 |
| 200 acres | | | $326,500 |

After

| | | | | |
|---|---|---|---|---|
| 10 | acres | High Bluff Waterfront | at $3,500 | $ 35,000 |
| 101 | acres | Interior Wooded Land | at $1,000 | 111,100* |
| 40 | acres | Low Land | at $ 300 | 12,000 |
| 151 | acres | | | $158,100 |

\* Severance Damages: $40,400

Government's Evidence

Garber:  $54,750   $100,050 Before
                   – 45,300 After
                   $ 54,750 Damages

Breakdown

| | | |
|---|---|---|
| 24 acres of land north of N. C. 345 | At $1,500 | $ 36,000 |
| 25 acres of land south of N. C. 345 | At $ 750 | 18,750 |
| 49 acres | | $ 54,750 |
| 151 acres in remainder tract | At $ 300 | 45,300 |
| 200 acres Total Before Taking: | | $100,050 |

Less: Remainder Tract After Taking
   151 acres at $300 per acre                    –45,300
                          Damages*               $ 54,750

*"My total of $54,750 is $34,750 for the 49 acres and $20,000 *severance damages.*"

Stick:   $60,000   $119,940 Before
                   – 58,940 After (including $12,000 sev-
                   $ 61,000  erance damages
                   – 1,000 for graveyard
                   $ 60,000 Damages

Breakdown

199.9 acres   Before Taking   At $600   per acre   $119,940
   Less: Value of Remainder Tract $58,940
         Severance Damages        12,000
                                                    – 70,940
                                                    $ 61,000

   Less: one acre (approximately) in "take"
         tract for graveyard                        – 1,000
                                                    $ 60,000

Value in the Taking: $49,000  (49 acres at $1,000 per acre)
Severance Damages: 12,000

$61,000
less graveyard:          1,000

$60,000  Total Damages for Taking

### Court's Valuation and Award

Date of Taking: December 23, 1964

The fair market value of the entire property immediately prior to the taking, including the condemned portion identified in this proceeding as Park Tract No. 25 (Griffin Tract) was $176,750.00.

The fair market value of the portion remaining immediately after the taking was $67,450.00.

The resulting and severance damage reflected in the valuation of the portion remaining immediately after the taking is $30,300.00.

### Breakdown of Court's Valuation

#### Before Taking

| | | | |
|---|---|---|---|
| 30 acres | High Bluff Waterfront | at $2,000 per acre | $ 60,000 |
| 29 acres | Interior Road Frontage | at $1,000 per acre | 29,000 |
| 101 acres | Interior Wooded Land | at $ 750 per acre | 75,750* |
| 40 acres | Low Land | at $ 300 per acre | 12,000 |
| 200 acres | Total Before Taking | | $176,750 |

#### After Taking

| | | | |
|---|---|---|---|
| 10 acres | High Bluff Waterfront | at $2,000 per acre | $ 20,000 |
| 101 acres | Interior Wooded Land | at $ 450 per acre | 45,450* |
| 40 acres | Low Land | at $ 300 per acre | 12,000 |
| 151 acres | Remaining After Taking | | $ 67,450 |

*Severance Damages*: The severance of the 49 acre "take" tract damaged the remainder in the amount of $30,300. This was computed at $300 per acre for the 101 acres of interior wooded land which was, in the Court's opinion, the portion of the remainder which was the more adversely affected of the three parts into which it was divided for purposes of valuation. Spread out over the entire remaining portion of 151 acres, the amount of severance damages would be just over $200 per acre. The following factors were taken into consideration by the Court in determining severance damages to the remainder tract:

1. removal of the best sound frontage;

2. removal of paved highway road frontage;

3. removal of access and virtual isolation of the remainder;

4. removal of higher-lying land, diminishing the amount available to raise and level lower-lying land for development purposes.

5. removal of attractive entrance "protection" afforded by the Fort Raleigh National Historic Site and the Elizabethan Garden.

Summary of Court's Valuation:

| | | |
|---|---|---|
| | $176,750 | Value of Entire Tract Before Taking |
| | −67,450 | Value of Remainder After Taking |
| | −67,450 | Value of Remainder After Taking |
| | $109,300 | Sub-Total |
| | − 1,000 | Exclusion for Graveyard |
| | $108,300 | Total Damages |

The amount which the Government should pay as just compensation for the property taken in this proceeding as Park Tract No. 25, exclusive of interest, is $108,300.00.

### ORDER for JUDGMENT

It is, therefore, Ordered that Judgment be entered allowing the ostensible owners of the several tracts taken in this proceeding to recover of the United States of America the foregoing amounts set forth in the Court's Valuation and Award for each tract, together with such interest to which they may be entitled;

It is further ordered that the Clerk shall serve copies of this Opinion and Order for Judgment and the Judgment filed herewith upon all counsel of record.

Let judgment be entered forthwith.